## Scott, et al. v. Thacker Coal Mining Company, et al.

(Decided March 22, 1921.)

### Appeal from Pike Circuit Court.

Boundaries—Description.—In the location of lines from descriptions in title papers, if there is a conflict between courses and distances and natural objects called for, the latter will control, and the courses and distances will be changed so as to conform to the natural objects called for. The rule is based upon the sound assumption that if there is a mistake, it is in the courses and distances and not in the fixed location of natural objects.

WILLIS STATON for appellants.

P. B. STRATTON, J. J. MOORE, J. F. BUTLER and J. S. CLINE for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

In June, 1900, Martha Scott leased certain lands on the Tug Fork of Big Sandy river in Pike county to the Thacker Coal Mining Co., for coal mining purposes. Prior thereto, in December, 1897, Richard Daniels and his wife leased to the same company for the same purposes adjoining tracts of land.

The coal company opened up the mining operations on these tracts of land, and having failed for a time to pay to Martha Scott the royalty to which she thought she was entitled on certain lands claimed to have been embraced in her boundary, she originally brought this suit, asking judgment for the amount of such royalties.

The coal company answered, admitting its operations under the lease from Mrs. Scott, and alleging that it was also operating under certain leases from Daniels on adjoining lands, and alleging that both Scott and Daniels were claiming that a certain tract of land upon which the company was operating was embraced in their several leases, and each claiming the royalties therefrom and

made its answer a counterclaim against the heirs of Daniels, and asked that the controversy between them be settled, and that it be directed by the court to whom it should pay the royalties.

The Daniels people came in and asserted their title to the disputed boundary, and the circuit court, upon a trial, in effect adjudged that neither of the parties had shown title in themselves and therefore declined to adjudge the royalties to either.

They each appealed to this court from the judgment, and it was reversed with directions to the lower court to establish the line and dispose of the royalties between the parties. Scott v. Daniels, 160 Ky. 365.

Upon the return of the case there was additional preparation, and upon a hearing the court adjudged the disputed boundary to the Daniels heirs, and from that judgment the Scott heirs have appealed.

Martha Scott is a daughter of Ephriam Hatfield and claims under a deed from him, and Ephriam Hatfield claimed under two patents, one issued in 1850 to Ferrell Evans, and the other to Ephriam Hatfield in 1867; the Daniels people claim under certain other patents but only claim to the Evans or Hatfield line; and so the vital thing in the controversy is a proper determination of where the Evans or Hatfield line is located, the lines of the Evans and Hatfield patents being the same so far as they affect the land in controversy.

Hatfield was the owner in 1867 of the Evans patent of 350 acres, and a patent was then issued to Hatfield for 793 acres, embracing the Evans 350 acre patent, together with certain other previously patented lands and still other lands claimed to have been vacant.

It is agreed between the parties that the calls in the two patents in question—the Evans and Hatfield patents—only affect this controversy after they leave the bank of the river at the mouth of Bear Tree Hollow; the evidence shows that the survey made for appellants at that point begins right at the bank of the river at or near the mouth of that small branch, while that made for the appellees, or at their suggestion, began some 75 to 90 feet away from the bank of the river, and that made only a slight divergence between them up to the point where the real disputed call comes in, which will be hereafter noticed. But in as much as appellants' survey began

immediately at the bank of the river and the previous call in the two patents calls for "two sycamores on the bank of said river," we have concluded that the beginning point at the mouth of that branch was more accurate in appellants' survey.

From that point on the calls in the Evans patent are as follows:

"Thence S. 21 W. 20 poles to a lynn and beech in Bear Tree Hollow; thence leaving the calls of said former survey (referring to a 150 acre previous survey made for Evans) S. 18 E. 52 poles to a white oak, hickory and sarvis on top of a ridge; S. 20 W. 134 po. *to two chestnut oaks, on top of the ridge between Sugar Camp Branch and Pound Mill Branch;* S. 83 W. 22 poles to a black oak and two hickories on the top of said ridge; S. 19 W. 53 poles to three white oaks; S. 4 W. 140 poles to a white oak, sourwood and gum in the gap at the head of the branch that empties into said river at said Evans' house."

The calls from that point in the Hatfield patent are as follows:

"Thence S. 21 W. 20 poles to a lynn and beech in the Bear Tree Hollow; S. 18 E. 52 poles to a white oak, hickory and sarvis on top of the ridge; S. 20 W. 134 poles *to two chestnut oaks on top of the ridge between the Sugar Camp and Pounding Mill Branch;* S. 83 W. 22 poles to a black and two hickories on top of sd. ridge; S. 19 W. 53 poles to two white oaks; S. 4 W. 140 poles to a white oak, sourwood and gum in the gap at the head of the branch that empties into the river just above sd. Hatfield's house." Appellants claim that the call S. 20 W. 134 poles should be extended so as to reach the natural object called for at B, while appellees claim it should stop at A and thence run with the ridge to C, and thence on the east and west ridges.

All the evidence in the record shows that the house referred to in these calls was occupied by Evans when his survey was made and patented in 1849 and '50, and that the same house was occupied by Hatfield when his survey and patent were made and issued in 1866 and '67.

The survey upon which Evans patent was issued calls for *two chestnut oaks on top of the ridge between Sugar Camp Branch and the Pound Mill Branch.* So that we have in one survey a stream called the *Pound Mill Branch,* and in the patent issued on that survey we have

A—Point appellees claim 134 pole call should end.
B—Point appellants claim 134 (or 314) pole call should end.

a stream called the *Pound Mill Branch,* and in a subsequent one embracing the same land, and with the same calls, we have a stream called the *Pounding Mill Branch.*

For a long time during the preparation of this case, before the first appeal, these were all treated as referring to the same stream, to-wit, Pounding Mill Branch, as shown on the map herewith filed, which, as will be observed, flows into the Tug river, its general direction being south, on the opposite side of the ridge from the Sugar Camp or Ferrell Evans Branch, the latter branch flowing north into the same river on the other side of a considerable bend in the river. But after the case had been submitted for hearing in the circuit court before the first appeal, the appellees had the order of submission set aside upon a showing in affidavits that they had learned that at one time in the past what is shown on the map as Fish Trap Branch had been called Pond Mill Branch, and that therefore the call in the two patents "S. 20 W. 134 poles to two chestnut oaks on top of the ridge between Sugar Camp and Pound or Pounding Mill Branch," really meant the ridge running north and south between the waters of said Fish Trap Branch and Sugar Camp Branch, and did not refer to the ridge running east and west between the head waters of the Sugar Camp Branch and the Pounding Mill Branch. Accordingly the order of submission was set aside and one of the appellees in a second deposition given by her states that she was born about 1850 in this immediate locality, and that in her childhood she had heard older persons refer to the Fish Trap Branch as Pond Mill Branch and that there yet remains evidence of an old dam on the Fish Trap Branch showing that in days gone by there had been a mill dam there.

This evidence was taken by the appellees in an effort to explain away the call in the two patents for the ridge between the waters of Sugar Camp and Pound or Pounding Mill Branch, because in the absence of a satisfactory explanation of that call it is recognized that the courses and distances in the patent must give way before the natural objects called for in them. In other words, even though the call for 134 poles gives out at a point which does not reach the ridge called for, in order to reach such natural object it will be extended so as to reach it, thereby following the well recognized rule of law that

courses and distances must give way to well known natural objects.

But this evidence that in her childhood the Fish Trap Branch had been called at times the Pond Mill Branch is not substantiated by the other reliable evidence in the record. On the contrary, in the many deeds and patents and surveys which are introduced in evidence in this record, many of them older than the witness claims to be, that stream is referred to only as the Fish Trap Branch and not in one single instance, so far as our search of the record discloses, has it been referred to as the Pond Mill Branch.

Our conclusion therefore is, from the whole evidence and from an examination of all these surveys and patents, that the ridge called for between the waters of Sugar Camp Branch and Pound or Pounding Mill Branch is the ridge running east and west, or approximately east and west, and which the call in question when extended reaches at or about the point of that ridge where it turns north, which is shown to be the dividing ridge between the head waters of those two streams.

That this conclusion is proper must be apparent when we consider that if it be conceded that Fish Trap Branch was once sometimes called Pond Mill Branch, the point on the ridge running north and south at which appellees claim the 134 pole call gives out, is not in fact on the ridge between Fish Trap Branch and Sugar Camp Branch, but is on a ridge between the Fish Trap Branch and the head waters of the Tinnie Branch which runs into the river east of the mouth of Sugar Camp Branch; there being a spur or ridge shooting off from the north and south ridge which divides the waters of the Sugar Camp Branch from the waters of Tinnie Branch and another small branch, and makes it impossible for the waters of Sugar Camp Branch to reach the point where they claim that call gives out and should stop.

On the other hand, the map on file and all the evidence shows that if the call of 134 poles is correct and must stop at the point where it gives out, it does not reach the ridge between Sugar Camp Branch and Pounding Mill Branch by nearly 200 poles at the nearest point, and it is therefore argued by appellants that the 134 pole call is manifestly a mistake and that it was intended originally to be a 314 pole call, the figures 1 and 3 being by mistake, transposed, which would in fact and does reach the

ridge at the nearest point between the waters of Sugar Camp Branch and Pounding Mill Branch.

The evidence that the Fish Trap Branch was ever known or called Pond Mill Branch being unsatisfactory, and the fact being apparent that if it had been, the 134 pole call would not end at a point on a ridge between the waters of Fish Trap or Pond Mill Branch and the waters of Sugar Camp Branch, the conclusion seems irresistible that there must have been some mistake in the distance of the original call, and that the call for the natural object, that is the ridge, between the waters of Pounding Mill Branch and Sugar Camp Branch, must prevail.

It has long been the rule in this state that, in the location of lines from descriptions in title papers, if there is a conflict between courses and distances and natural objects called for, the latter will control and the courses and distances will be changed or modified so as to conform to the natural objects called for.

Natural objects have a fixed place; they are there for all time, while courses and distances as shown by title papers are merely records made by men and which may or may not be accurate. And not only so, it is a matter of practical knowledge that surveyors ordinarily make up their reports long after they have actually run the lines, if in fact they do actually run them. And the rule is therefore based upon the sound assumption that if there is a mistake it is in the courses and distances and not in the fixed location of natural objects. Kentweva Coal & Lumber Co. v. Helton, 170 Ky. 211; Rush v. Cornett, 169 Ky. 714; Gilbert v. Parrott, 168 Ky. 599.

Our conclusion that the call in question should be extended to the natural object called for, is further strongly fortified by a subsequent call in the patent for another natural object, to-wit: "S. 4 W. 140 poles to a white oak, sourwood and gum in the gap at the head of the branch that empties into the river just above said Hatfield's house." Although the course fixed in this call is clearly wrong the map on file as well as all the evidence shows that there is such a gap right at the head of the main fork of the branch called the Sugar Camp Branch which flows into the river right at or near Hatfield's house, being the same house formerly occupied by Evans, and called for in both patents.

It is conceded by the parties on both sides that the surveys will not close if the lines are run as contended

by either party, and we confess that after long, diligent and earnest labor we have been unable to reach any conclusion in any way satisfactory to ourselves except to apply the rule that we have applied as to the natural objects involved.

We have prepared and file herewith a small map to be published with this opinion, giving some idea of the nature of this controversy.

It results from what we have said that when the Hatfield or Evans line is located with reference to these natural objects, it embraces the disputed land in plaintiffs' conveyance and it and the royalties should have been adjudged to them.

The judgment is reversed, with directions to enter a judgment as herein indicated.

Whole court, except Judge Clarke, sitting.